IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| Jamie Gavin, Lindsay Gibbons, and Jhamya Winters,<br><br>*On behalf of themselves and those similarly situated,*<br><br>         Plaintiff,<br>    v.<br><br>Lady Jane's Haircuts for Men Holding Company, LLC; Lady Jane's Clearwater FL, LLC; Lady Jane's Moore OK, LLC; Lady Jane's Sunset Hills MO, LLC; Chad Johnson; Tim McCollum; Jesse Dhillon; Alicia Bunch; John Doe 1–10; and Doe Corporation 1-10,<br><br>         Defendants. | Case No. 2:23-cv-12602<br><br><br>Judge<br>Magistrate Judge<br><br><br>Class Action<br><br>Demand for Jury Trial |

CLASS AND COLLECTIVE ACTION COMPLAINT

1.     Lady Jane's misclassifies its stylists as "independent contractors" despite the circumstances of the stylists' work establishing that they are actually "employees" under state and federal wage laws.

2.     Jamie Gavin, Lindsay Gibbons, and Jhamya Winters, on behalf of themselves and all similarly-situated individuals, bring this action under 29 U.S.C. §

201(b) and Missouri, Florida, and Oklahoma state law against Lady Jane's Haircuts for Men Holding Company, LLC; Lady Jane's Clearwater FL, LLC; Lady Jane's Moore OK, LLC; Lady Jane's Sunset Hills MO, LLC (the "Entity Defendants"); Chad Johnson; Tim McCollum; Jesse Dhillon; Alicia Bunch; John Doe 1–10; and Doe Corporation 1-10, (collectively "Defendants"). This action seeks appropriate monetary, declaratory, and equitable relief based on Defendants' willful failure to compensate Jamie Gavin, Lindsay Gibbons, and Jhamya Winters (collectively "Plaintiffs"), and similarly-situated individuals with minimum wages and overtime wages as required by the Fair Labor Standards Act ("FLSA"), Florida Constitution, Art. X, § 24, Missouri Minimum Wage Act, R.S. Mo. §§ 290.500, *et seq.* ("MMWA"); the Oklahoma Minimum Wage Act, §40-197 ("OMWA"), and damages under the theory of unjust enrichment.

3.     Defendants operate Lady Jane's, a men's only hair salon that operates over 100 stores throughout the United States.

4.     Plaintiffs seek to represent the hairstylists who work for Lady Jane's in the United States, other than Ohio ("stylists" or "Lady Jane's stylists").[1]

---

[1] A similar action on behalf of the Lady Jane's stylists that work/worked at a Lady Jane's salon in Ohio is currently pending in the Southern District of Ohio, and titled, *Tammy Kennedy v. Lady Jane's Haircuts for Men Holding Company, LLC, et al*, Case No. 1:23-cv-00493-MPB.

5.      Defendants repeatedly and willfully violated the FLSA, Florida Constitution, Art. X, § 24, the MMWA, and the OMWA by failing to pay the stylists the legally mandated minimum wage and overtime for all hours worked.

6.      All of the Lady Jane's stylists have been subject to the same or similar employment policies and practices.

## Jurisdiction and Venue

7.      This Court has jurisdiction over Plaintiffs' FLSA claims under 28 U.S.C. § 1331 and 29 U.S.C. § 216(b).

8.      This Court has supplemental jurisdiction over Plaintiffs' Missouri, Florida, and Oklahoma state law claims under 28 U.S.C. § 1367.

9.      Venue in this Court is proper under 28 U.S.C. § 1391(b) because Defendants reside in this district, and a substantial part of the events giving rise to the claim herein occurred in this district.

## Parties

**Plaintiff**

**Jamie Gavin**

10.     Plaintiff Jamie Gavin resides in St. Louis, Missouri.

11.     At all times relevant herein, Plaintiff was an "employee" of Defendants as defined in the FLSA, the MMWA, and the Florida Constitution, Art. X, § 24.

12.     Jamie Gavin has given written consent to join this action, a copy of which is attached to this Class and Collective Action Complaint.

**Lindsay Gibbons**

13.     Plaintiff Lindsay Gibbons resides in Clearwater, Florida.

14.     At all times relevant herein, Plaintiff was an "employee" of Defendants as defined in the FLSA, and the Florida Constitution, Art. X, § 24.

15.     Lindsay Gibbons has given written consent to join this action, a copy of which is attached to this Class and Collective Action Complaint.

**Jhamya Winters**

16.     Plaintiff Jhamya Winters resides in Moore, Oklahoma.

17.     At all times relevant herein, Plaintiff was an "employee" of Defendants as defined in the FLSA, the OMWA.

18.     Jhamya Winters has given written consent to join this action, a copy of which is attached to this Class and Collective Action Complaint.

**Defendants**

19.     Defendants' salons are owned and operated by a number of entities and individuals, each of whom employ Plaintiffs and the similarly situated Lady Jane's stylists.

20.     The Defendants misclassified Plaintiffs and the similarly situated Lady Jane's stylists as "independent contractors."

21.     Plaintiffs and the similarly situated Lady Jane's stylists were and are employees of Defendants under the FLSA, Florida Constitution, Art. X, § 24, and the MMWA, and the OMWA.

22.     Each of the Defendants had control over Plaintiffs and the similarly situated Lady Jane's stylists' working conditions.

23.     At all relevant times, Defendants have shared or co-determined those matters governing the essential terms and conditions of employment for Plaintiffs and the similarly situated Lady Jane's stylists at Defendants' salons.

24.     At all relevant times, Defendants have had direct or indirect control over the terms and conditions of Plaintiffs' work and the work of similarly situated Lady Jane's stylists.

25.     At all relevant times, Defendants possessed the authority to control the terms and conditions of Plaintiffs' employment and the employment of the similarly situated Lady Jane's stylists, and Defendants have exercised that authority.

26.     Defendants suffered or permitted Plaintiffs and the similarly situated Lady Jane's stylists to work.

**Lady Jane's Haircuts for Men Holding Company, LLC**

27.    Defendant Lady Jane's Haircuts for Men Holding Company, LLC, is a domestic limited liability company registered to do business in the State of Michigan.

28.    Lady Jane's Haircuts for Men Holding Company, LLC is headquartered at 13991 Hall Road, Shelby Township, MI 48315, and its registered agent is Defendant Chad Johnson.

29.    Lady Jane's Haircuts for Men Holding Company, LLC was founded by and is owned and/or operated by Defendant Chad Johnson.

30.    Upon information and belief, Lady Jane's Haircuts for Men Holding Company, LLC is the parent company that owns the individual entities that own and operate each Lady Jane's salon location.

31.    Lady Jane's Haircuts for Men Holding Company, LLC controls the individual entities that own and operate all Lady Jane's salons.

32.    Lady Jane's Haircuts for Men Holding Company, LLC, and the individual entities it owns, make up the Lady Jane's Haircuts for Men operation.

33.    Lady Jane's Haircuts for Men Holding Company, LLC, and the entities it owns, form a "single employer" as they are part of a single integrated enterprise and/or they are joint employers as they jointly operate the Lady Jane's salons and

maintain interrelated operations, centralized control of labor relations, common management and common ownership and financial control.

34.     Because the work performed by Plaintiffs and all other Lady Jane's stylists benefited Lady Jane's Haircuts for Men Holding Company, LLC and directly or indirectly furthered its joint interests, Lady Jane's Haircuts for Men Holding Company, LLC is a joint employer of Plaintiffs and the similarly situated Lady Jane's stylists under the FLSA's definition of "employer."

35.     Lady Jane's Haircuts for Men Holding Company, LLC oversees the operations at all Lady Jane's salons.

36.     Lady Jane's Haircuts for Men Holding Company, LLC has substantial control over Plaintiffs and the similarly situated Lady Jane's stylists' work, their working conditions, and over the unlawful policies and practices alleged herein.

37.     Lady Jane's Haircuts for Men Holding Company, LLC directly or indirectly controls/controlled the terms and conditions of Plaintiffs' work and the work of similarly situated Lady Jane's stylists.

38.     Lady Jane's Haircuts for Men Holding Company, LLC maintained control, oversight, and direction over Plaintiffs and the similarly situated Lady Jane's stylists, including, but not limited to, hiring, firing, disciplining, timekeeping, payroll, reimbursements, pay rates, deductions, and other practices.

39.     Upon information and belief, Lady Jane's Haircuts for Men Holding Company, LLC applied or caused to be applied substantially the same employment policies, practices, and procedures to all Lady Jane's stylists, including policies, practices and procedures relating to payment of minimum wages, overtime wages, scheduling, and timekeeping.

40.     Lady Jane's Haircuts for Men Holding Company, LLC is an "employer" of Plaintiffs and the Lady Jane's stylists as that term is defined by the FLSA, the MMWA, the OMWA, and the Florida Constitution.

41.     Lady Jane's Haircuts for Men Holding Company, LLC is an enterprise engaged in "the production of goods for commerce" within the meaning of the phrase as used in the FLSA.

42.     Lady Jane's Haircuts for Men Holding Company, LLC has gross revenue that exceeds $500,000 per year.

**Lady Jane's Clearwater FL, LLC**

43.     Defendant Lady Jane's Clearwater FL, LLC, is a Michigan limited liability company registered to do business in the State of Florida.

44.     Lady Jane's Clearwater FL, LLC is headquartered at 34915 Woodward Ave., Birmingham MI 48009, and its registered agent is Defendant Chad Johnson.

45.    Lady Jane's Clearwater FL, LLC was founded by, and is owned and/or operated by, Defendant Chad Johnson either individually or through his ownership of Lady Jane's Haircuts for Men Holding Company, LLC.

46.    Lady Jane's Clearwater FL, LLC is the entity that appears on Plaintiffs Lindsay Gibbons' and Jamie Gavin's 1099s.

47.    Lady Jane's Clearwater FL, LLC has substantial control over Plaintiffs Lindsay Gibbons' and Jamie Gavin's work, their working conditions, and over the unlawful policies and practices alleged herein.

48.    Lady Jane's Clearwater FL, LLC directly or indirectly controls/controlled the terms and conditions of Plaintiffs Lindsay Gibbons' and Jamie Gavin's work.

49.    Lady Jane's Clearwater FL, LLC maintained control, oversight, and direction over Plaintiffs Lindsay Gibbons and Jamie Gavin, including, but not limited to, hiring, firing, disciplining, timekeeping, payroll, reimbursements, pay rates, deductions, and other practices.

50.    Lady Jane's Clearwater FL, LLC is an "employer" of Plaintiffs Lindsay Gibbons and Jamie Gavin as that term is defined by the FLSA, and the Florida Constitution.

51.     Lady Jane's Clearwater FL, LLC is an enterprise engaged in "the production of goods for commerce" within the meaning of the phrase as used in the FLSA.

52.     Lady Jane's Clearwater FL, LLC has gross revenue that exceeds $500,000 per year.

**Lady Jane's Moore OK, LLC**

53.     Defendant Lady Jane's Moore OK, LLC, is a Michigan limited liability company registered to do business in the State of Oklahoma.

54.     Lady Jane's Moore OK, LLC is headquartered at 34915 Woodward Ave., Birmingham, MI 48009, and its registered agent is Defendant Chad Johnson.

55.     Lady Jane's Moore OK, LLC was founded by and is owned and/or operated by Defendant Chad Johnson either individually or through his ownership of Lady Jane's Haircuts for Men Holding Company, LLC.

56.     Lady Jane's Moore OK, LLC is the entity that appears on Plaintiff Jhamya Winters'1099s.

57.     Lady Jane's Moore OK, LLC has substantial control over Jhamya Winters and the similarly situated Lady Jane's stylists' work, their working conditions, and over the unlawful policies and practices alleged herein.

58. Lady Jane's Moore OK, LLC directly or indirectly controls/controlled the terms and conditions of Jhamya Winters' work and the work of similarly situated Lady Jane's stylists.

59. Lady Jane's Moore OK, LLC maintained control, oversight, and direction over Jhamya Winters and the similarly situated Lady Jane's stylists, including, but not limited to, hiring, firing, disciplining, timekeeping, payroll, reimbursements, pay rates, deductions, and other practices.

60. Upon information and belief, Lady Jane's Moore OK, LLC applied or caused to be applied substantially the same employment policies, practices, and procedures to all Lady Jane's stylists, including policies, practices and procedures relating to payment of minimum wages, overtime wages, scheduling, and timekeeping.

61. Lady Jane's Moore OK, LLC is an "employer" of Jhamya Winters and the Lady Jane's stylists as that term is defined by the FLSA, and the OMWA.

62. Lady Jane's Moore OK, LLC is an enterprise engaged in "the production of goods for commerce" within the meaning of the phrase as used in the FLSA.

63. Lady Jane's Moore OK, LLC has gross revenue that exceeds $500,000 per year.

11

**Lady Jane's Sunset Hills MO, LLC**

64.    Defendant Lady Jane's Sunset Hills MO, LLC, is a Michigan limited liability company registered to do business in the State of Missouri.

65.    Lady Jane's Sunset Hills MO, LLC is headquartered at 34915 Woodward Ave., Birmingham, MI 48009, and its registered agent is Defendant Chad Johnson.

66.    Lady Jane's Sunset Hills MO, LLC was founded by and is owned and/or operated by Defendant Chad Johnson either individually or through his ownership of Lady Jane's Haircuts for Men Holding Company, LLC.

67.    Lady Jane's Sunset Hills MO, LLC is the entity that appears on Plaintiff Jamie Gavin's 1099s.

68.    Lady Jane's Sunset Hills MO, LLC has substantial control over Jamie Gavin and the similarly situated Lady Jane's stylists' work, their working conditions, and over the unlawful policies and practices alleged herein.

69.    Lady Jane's Sunset Hills MO, LLC directly or indirectly controls/controlled the terms and conditions of Jamie Gavin's work and the work of similarly situated Lady Jane's stylists.

70.    Lady Jane's Sunset Hills MO, LLC maintained control, oversight, and direction over Jamie Gavin and the similarly situated Lady Jane's stylists, including,

but not limited to, hiring, firing, disciplining, timekeeping, payroll, reimbursements, pay rates, deductions, and other practices.

71.    Upon information and belief, Lady Jane's Sunset Hills MO, LLC applied or caused to be applied substantially the same employment policies, practices, and procedures to all Lady Jane's stylists, including policies, practices and procedures relating to payment of minimum wages, overtime wages, scheduling, and timekeeping.

72.    Lady Jane's Sunset Hills MO, LLC is an "employer" of Jamie Gavin and the Lady Jane's stylists as that term is defined by the FLSA, and the MMWA.

73.    Lady Jane's Sunset Hills MO, LLC is an enterprise engaged in "the production of goods for commerce" within the meaning of the phrase as used in the FLSA.

74.    Lady Jane's Sunset Hills MO, LLC has gross revenue that exceeds $500,000 per year.

**Chad Johnson**

75.    Chad Johnson is the founder and owner of the Entity Defendants.

76.    Chad Johnson is involved in the operation of the Entity Defendants.

77.    Chad Johnson is the registered agent for several of the Entity Defendants.

78.     Upon information and belief, Chad Johnson is the CEO of the Entity Defendants.

79.     Through the Entity Defendants, Chad Johnson owns and operates Lady Jane's Haircuts for Men.

80.     Chad Johnson supervised and directed the employment of Plaintiffs and the Lady Jane's stylists.

81.     Chad Johnson is individually liable under the definitions of "employer" set forth in the FLSA, Florida Constitution, Art. X, § 24, the MMWA, and the OMWA because he owns and operates the Entity Defendants, serves as a member of the Entity Defendants, ultimately controls significant aspects of the Entity Defendants' day-to-day functions, and ultimately controls compensation of the Lady Jane's stylists. 29 U.S.C. § 203(d); FL. Const., Art. X, § 24; R.S. Mo. §§290.500, *et. seq.*, and 40 OK Stat. §40-197.

82.     At all relevant times, by virtue of his role as owner and/or CEO of the Entity Defendants, Chad Johnson has had financial control over the operations of each of the Entity Defendants.

83.     At all relevant times, by virtue of his role as owner and/or CEO of the Entity Defendants, Chad Johnson has a role in significant aspects of the Entity Defendants' day-to-day operations.

14

84.     At all relevant times, by virtue of his role as owner and/or CEO of the Entity Defendants, Chad Johnson has had control over the Entity Defendants' pay policies.

85.     At all relevant times, by virtue of his role as owner and/or CEO of Entity Defendants, Chad Johnson has had power over personnel and payroll decisions of the Entity Defendants.

86.     At all relevant times, by virtue of his role as owner and/or CEO of the Entity Defendants, Chad Johnson has had the power to hire, fire and discipline employees, including Plaintiffs and the similarly situated Lady Jane's stylists.

87.     At all relevant times, by virtue of his role as owner and/or CEO of the Entity Defendants, Chad Johnson has had the power to stop any illegal pay practices that harmed Plaintiffs and the similarly situated Lady Jane's stylists.

88.     At all times relevant, by virtue of his role as owner and/or CEO of Entity Defendants, Chad Johnson has had the power to transfer the assets and liabilities of the Entity Defendants.

89.     At all relevant times, by virtue of his role as owner and/or CEO of the Entity Defendants, Chad Johnson has had the power to declare bankruptcy on behalf of the Entity Defendants.

90.     At all relevant times, by virtue of his role as owner and/or CEO of the Entity Defendants, Chad Johnson has had the power to enter into contracts on behalf of the Entity Defendants.

91.     At all relevant times, by virtue of his role as owner and/or CEO of the Entity Defendants, Chad Johnson has had the power to close, shut down, and/or sell the Entity Defendants.

92.     At all relevant times, by virtue of his role as owner and/or CEO of the Entity Defendants, Chad Johnson had authority over the overall direction of the Entity Defendants and was ultimately responsible for their operations.

93.     The Entity Defendants function for Chad Johnson's profit.

94.     Chad Johnson has influence over how the Entity Defendants can run more profitably and efficiently.

**Tim McCollum**

95.     Tim McCollum is the President of the Entity Defendants.

96.     Tim McCollum is involved in the operation of the Entity Defendants.

97.     Through the Entity Defendants, Tim McCollum owns and operates Lady Jane's Haircuts for Men.

98.     Tim McCollum supervised and directed the employment of Plaintiffs and the similarly situated Lady Jane's stylists.

99. Tim McCollum is individually liable under the definitions of "employer" set forth in the FLSA, Florida Constitution, Art. X, § 24, the MMWA, and the OMWA because he owns and operates the Entity Defendants, serves as a member of the Entity Defendants, ultimately controls significant aspects of the Entity Defendants' day-to-day functions, and ultimately controls compensation of the Lady Jane's stylists. 29 U.S.C. § 203(d); FL. Const., Art. X, § 24. R.S. Mo. §§290.500, *et. seq.*, and 40 OK Stat. §40-197.

100. At all relevant times, by virtue of his role as President of the Entity Defendants, Tim McCollum has had financial control over the operations of each of the Entity Defendants.

101. At all relevant times, by virtue of his role as President of the Entity Defendants, Tim McCollum has a role in significant aspects of the Entity Defendants' day-to-day operations.

102. At all relevant times, by virtue of his role President of the Entity Defendants, Tim McCollum has had control over the Entity Defendants' pay policies.

103. At all relevant times, by virtue of his role as President of the Entity Defendants, Tim McCollum has had power over personnel and payroll decisions at the Entity Defendants.

104.    At all relevant times, by virtue of his role as President of the Entity Defendants Tim McCollum has had the power to hire, fire and discipline employees, including Plaintiffs and the similarly situated Lady Jane's stylists.

105.    At all relevant times, by virtue of his role as President of the Entity Defendants, Tim McCollum has had the power to stop any illegal pay practices that harmed Plaintiffs and the similarly situated Lady Jane's stylists.

106.    At all times relevant, by virtue of his role as President of Entity Defendants, Tim McCollum has had the power to transfer the assets and liabilities of the Entity Defendants' corporate entities.

107.    At all relevant times, by virtue of his role as President of the Entity Defendants, Tim McCollum has had the power to declare bankruptcy on behalf of the Entity Defendants.

108.    At all relevant times, by virtue of his role as President of the Entity Defendants, Tim McCollum has had the power to enter into contracts on behalf of the Entity Defendants.

109.    At all relevant times, by virtue of his role as President of the Entity Defendants, Tim McCollum has had the power to close, shut down, and/or sell the Entity Defendants.

110.    At all relevant times, by virtue of his role as President of the Entity Defendants, Tim McCollum had authority over the overall direction of the Entity Defendants and was ultimately responsible for their operations.

111.    The Entity Defendants function for Tim McCollum's profit.

112.    Tim McCollum has influence over how the Entity Defendants can run more profitably and efficiently.

**Jesse Dhillon**

113.    Jesse Dhillon is the Vice-President of the Entity Defendants.

114.    Jesse Dhillon is involved in the operation of the Entity Defendants.

115.    Through the Entity Defendants, Jesse Dhillon owns and operates Lady Jane's Haircuts for Men.

116.    Jesse Dhillon supervised and directed the employment of Plaintiffs and the Lady Jane's stylists.

117.    Jesse Dhillon is individually liable under the definitions of "employer" set forth in the FLSA, the Florida Constitution, the MMWA, and the OMWA, because he owns and operates the Entity Defendants, serves as a member of the Entity Defendants, ultimately controls significant aspects of the Entity Defendants' day-to-day functions, and ultimately controls compensation of the Lady Jane's

stylists. 29 U.S.C. § 203(d); FL. Const., Art. X, § 24; R.S. Mo. §§290.500, *et. seq.*, and 40 OK Stat. §40-197.

118.     At all relevant times, by virtue of his role as Vice-President of the Entity Defendants, Jesse Dhillon has had financial control over the operations at each of the Entity Defendants.

119.     At all relevant times, by virtue of his role as Vice-President of the Entity Defendants, Jesse Dhillon has a role in significant aspects of the Entity Defendants' day-to-day operations.

120.     At all relevant times, by virtue of his role Vice-President of the Entity Defendants, Jesse Dhillon has had control over the Entity Defendants' pay policies.

121.     At all relevant times, by virtue of his role as Vice-President of Entity Defendants, Jesse Dhillon has had power over personnel and payroll decisions at the Entity Defendants.

122.     At all relevant times, by virtue of his role as Vice-President of the Entity Defendants Jesse Dhillon has had the power to hire, fire and discipline employees, including Plaintiffs and the Lady Jane's stylists.

123.     At all relevant times, by virtue of his role as Vice-President of the Entity Defendants, Jesse Dhillon has had the power to stop any illegal pay practices that harmed Plaintiffs and the Lady Jane's stylists.

124.     At all times relevant, by virtue of his role as Vice-President of the Entity Defendants, Jesse Dhillon has had the power to transfer the assets and liabilities of the Entity Defendants' corporate entities.

125.     At all relevant times, by virtue of his role as Vice-President of Entity Defendants, Jesse Dhillon has had the power to declare bankruptcy on behalf of the Entity Defendants.

126.     At all relevant times, by virtue of his role as Vice-President of Entity Defendants, Jesse Dhillon has had the power to enter into contracts on behalf of the Entity Defendants.

127.     At all relevant times, by virtue of his role as Vice-President of the Entity Defendants, Jesse Dhillon has had the power to close, shut down, and/or sell Entity Defendants.

128.     At all relevant times, by virtue of his role as Vice-President of the Entity Defendants, Jesse Dhillon had authority over the overall direction of the Entity Defendants and is ultimately responsible for their operations.

129.     The Entity Defendants function for Jesse Dhillon's profit.

130.     Jesse Dhillon has influence over how the Entity Defendants can run more profitably and efficiently.

**Alicia Bunch**

131.    Alicia Bunch is the Chief Operating Officer ("COO") of the Entity Defendants.

132.    Alicia Bunch is involved in the operation of the Entity Defendants.

133.    Through the Entity Defendants, Alicia Bunch owns and operates Lady Jane's Haircuts for Men.

134.    Alicia Bunch supervised and directed the employment of Plaintiffs and the similarly situated Lady Jane's stylists.

135.    Alicia Bunch is individually liable under the definitions of "employer" set forth in the FLSA, Florida Constitution, Art. X, § 24, the MMWA, and the OMWA because she owns and operates the Entity Defendants, serves as a member of the Entity Defendants, ultimately controls significant aspects of the Entity Defendants' day-to-day functions, and ultimately controls compensation of the Lady Jane's stylists. 29 U.S.C. § 203(d); FL Const., Art. X, § 24 R.S. Mo. §§290.500, *et. seq.*, and 40 OK Stat. §40-197.

136.    At all relevant times, by virtue of her role as COO of the Defendant Entities, Alicia Bunch has had financial control over the operations of each of the Entity Defendants.

137.    At all relevant times, by virtue of her role as Alicia Bunch of the Entity Defendants, Alicia Bunch has a role in significant aspects of the Entity Defendants' day-to-day operations.

138.    At all relevant times, by virtue of her role as COO of the Entity Defendants, Alicia Bunch has had control over the Entity Defendants' pay policies.

139.    At all relevant times, by virtue of her role as COO of the Entity Defendants, Alicia Bunch has had power over personnel and payroll decisions of the Entity Defendants.

140.    At all relevant times, by virtue of her role as COO of the Entity Defendants, Alicia Bunch has had the power to hire, fire and discipline employees, including Plaintiffs and the similarly situated Lady Jane's stylists.

141.    At all relevant times, by virtue of her role as COO of the Entity Defendants, Alicia Bunch has had the power to stop any illegal pay practices that harmed Plaintiffs and the similarly situated Lady Jane's stylists.

142.    At all times relevant, by virtue of her role as COO of the Entity Defendants, Alicia Bunch has had the power to transfer the assets and liabilities of the Entity Defendants' corporate entities.

143.    At all relevant times, by virtue of her role as COO of the Entity Defendants, Alicia Bunch has had the power to declare bankruptcy on behalf of the Entity Defendants.

144.    At all relevant times, by virtue of her role as COO of the Entity Defendants, Alicia Bunch has had the power to enter into contracts on behalf of the Entity Defendants.

145.    At all relevant times, by virtue of her role as COO of the Entity Defendants, Alicia Bunch has had the power to close, shut down, and/or sell the Entity Defendants.

146.    At all relevant times, by virtue of her role as COO of the Entity Defendants, Alicia Bunch had authority over the overall direction of the Entity Defendants and was ultimately responsible for their operations.

147.    The Entity Defendants function for Alicia Bunch's profit.

148.    Alicia Bunch has influence over how the Entity Defendants can run more profitably and efficiently.

**Doe Corporations 1-10**

149.    Upon information and belief, Defendants own, operate, and control other entities and/or limited liability companies in whole or in part that also qualify

as "employers" of Plaintiffs and the similarly situated Lady Jane's stylists as that term is defined by the FLSA and Missouri, Florida, and Oklahoma wage law.

150.     The identities of these additional Defendants should be revealed as discovery progresses and can be named at that time.

**John Doe 1-10**

151.     Upon information and belief, there are additional individuals who also qualify as "employers" of Plaintiffs and the similarly situated Lady Jane's stylists as that term is defined by the FLSA and Missouri, Florida, and Oklahoma wage law.

152.     Upon information and belief, Chad Johnson has entered into co-owner relationships with business partners, and those individuals might also qualify as "employers" of Plaintiffs and the similarly situated Lady Jane's stylists as the term is defined by the FLSA and Missouri, Florida, and Oklahoma wage law.

153.     The identities of these additional Defendants should be revealed as discovery progresses and can be named at that time.

## FACTS

## CLASS WIDE FACTUAL ALLEGATIONS

154.     During all relevant times, Defendants have operated the Defendants' Lady Jane's salons.

155.    Defendants' Lady Jane's salons employ stylists to perform styling and grooming services for men.

156.    Defendants' Lady Jane's salons required Plaintiffs and the similarly situated Lady Jane's stylists to execute "independent contractor agreements."

157.    The terms of the "independent contractor agreements" do not reflect the working conditions, policies or pay practices at the Defendants' Lady Jane's salons.

158.    The Lady Jane's stylists are not independent contractors, but employees.

159.    The Lady Jane's stylists worked for Defendants in a continuous and indefinite relationship.

160.    The Lady Jane's stylists are trained and skilled stylists that are expected to "stay on the cutting edge of the cosmetology industry."

161.    Lady Jane's provides the workspace, advertising, software, phone systems, insurance, marketing, cleaning supplies, and products for the Lady Jane's stylists to perform their work for Defendants.

162.    Lady Jane's stylists do not have the opportunity to profit based on their skill because Defendants control the prices they are allowed to charge and services they provide.

26

163. Lady Jane's stylists' economic status is inextricably linked to the services they can provide and the prices they can charge, both of which are completely controlled by Defendants.

164. The Lady Jane's stylists do the work that Defendants make money from—providing hair cutting and other salon services for men.

165. The stylists are scheduled for regular shifts so that they can provide services to any customers who come to the salon during operating hours.

166. Defendants utilize a central management team that monitors and controls the operations and finances of each Lady Jane's salon location.

167. Defendants' customers pay Defendants for the services provided by Lady Jane's stylists, not the stylists themselves.

168. Defendants Chad Johnson, Tim McCollum, Jess Dhillon, and Alicia Bunch are all part of Lady Jane's central management team.

169. The Entity Defendants and the central management team review applications of potential Lady Jane's stylists, including the potential stylists' professional experience in the following categories: Salon Experience, Haircut Experience, Clipper Experience, and Men's Hairstyling Experience.

170. Lady Jane's stylists hold themselves out to customers as representatives of Lady Jane's rather than as independent contractors.

171.    The Entity Defendants and central management team monitor each Lady Jane's location to ensure Lady Jane's stylists follow Lady Jane's company-wide policies and procedures.

172.    The Entity Defendants and the central management team monitor the services charged and tips received by the stylists.

173.    Defendants' Lady Jane's salons charge Plaintiffs and the similarly situated Lady Jane's stylists for the right to work in the salons. Defendants charge the hair stylists a set percentage of each service (e.g., 60%), which Defendants characterize as "rent."

174.    Defendants require that stylists pay at least $150 per month in "rent" payments. If the stylists do not generate $150 per month in "rent" payments, they are required by Defendants to pay the difference to the company.

175.    Defendants' Lady Jane's salons make money from Plaintiffs and the similarly situated Lady Jane's stylists through service charges; product sales; booth rentals; and other miscellaneous fees.

176.    Once a stylist begins working at one of the Defendants' Lady Jane's salons, the reality of the working relationship between the stylist and Lady Jane's is that of an employer-employee.

177.    The stylists are required to work at times designated by Defendants. If they are not able to make their shift, they need to find coverage from one of the other stylists.

178.    Defendants require Plaintiffs and the similarly situated Lady Jane's stylists to pay a monthly minimum dollar amount as "rent."

179.    Defendants require Plaintiffs and the similarly situated Lady Jane's stylists to pay a percentage of their stylist service sales as "rent."

180.    Defendants require Plaintiffs and the similarly situated Lady Jane's stylists to pay a percentage of their product sales as "rent."

181.    Defendants require Plaintiffs and the similarly situated to pay a nominal amount every day into a "product fund."

182.    Contrary to the terms of Defendants' independent contractor agreements Plaintiffs and the similarly situated Lady Jane's stylists do not have control over the method, manner, and means of performing their services.

183.    Defendants require the Plaintiffs and the similarly situated Lady Jane's stylists to charge the prices set by Defendants for the services the Lady Jane's stylists perform for the customers.

184.    The price charged to clients for each service is based on Defendants' menu of services.

185.    Defendants control the services Plaintiffs and the similarly situated Lady Jane's stylists may provide and the price of those services by listing the services and prices on the shop wall for customers to see.

186.    The same menu of services is offered at each of Defendants' Lady Jane's locations nationwide.

187.    Defendants' Lady Jane's salons require Plaintiffs and the similarly situated Lady Jane's stylists to follow Defendants' customer services expectations.

188.    Defendants' Lady Jane's salons do not pay Plaintiffs and the similarly situated Lady Jane's stylists a direct wage.

189.    Plaintiffs and the similarly situated Lady Jane's stylists receive a percentage of the final service charge clients pay.

190.    Defendants deduct shop charges and applicable promotional discounts from the total service charge clients pay to establish the final service charge.

191.    Plaintiffs and the Lady Jane's stylists were not paid directly by the clients whom they provided services to, but were instead paid by Defendants after they had taken "rent" from their service charges.

192.    Defendants charge Plaintiffs and the similarly situated Lady Jane's stylists 60% of the money the stylists earn for the services performed and 86% for the products sold as the stylists' "rent."

193.    In reality, Defendants are using a piece rate payment system to compensate Plaintiffs and the similarly situated Lady Jane's stylists.

194.    Defendants also charge Plaintiffs and the similarly situated Lady Jane's stylists 3% of each credit card payment the Lady Jane's stylist accepts.

195.    Contrary to the terms of Defendants' independent contractor agreements Lady Jane's stylists do not have control over their own schedules.

196.    Defendants require Plaintiffs and the similarly situated Lady Jane's stylists to work ten-hour shifts.

197.    Defendants enforce a Performance Agreement on Plaintiffs and the similarly situated Lady Jane's stylists.

198.    The Performance Agreement requires Lady Jane's stylists to agree to arrive to work 15 minutes before their scheduled start time.

199.    The Performance Agreement requires Lady Jane's stylists to agree to follow salon policies on call-outs and shift coverage.

200.    If a Lady Jane's stylist is late for a shift, she will receive a verbal warning from Defendants.

201.    If a Lady Jane's stylist is late for a second shift, she will be sent home or lose a day on an upcoming schedule.

202.    If a Lady Jane's stylist needs or wants to work less than 10 hours a day, she is responsible for getting coverage for the remainder of the 10-hour shift.

203.    Defendants require Lady Jane's stylists to work a set number of days each week.

204.    Defendants require Plaintiffs and the similarly situated Lady Jane's stylists to provide a report of the reason the stylist is leaving a shift early.

205.    Defendants monitor the scheduling of the Lady Jane's stylists at each location.

206.    Defendants require the Lady Jane's stylists to submit requests for days off.

207.    The central management team sets the schedules of Plaintiffs and the similarly situated Lady Jane's stylists.

208.    Lady Jane's stylists are not permitted to leave the salon on their scheduled shifts even if they do not have any customers to service.

209.    Lady Jane's stylists are not free to offer unique services or unique customer experiences, such as offering candy, that the company does not approve.

210.    Defendants utilize a customized point-of-sale (POS) system.

211.    Defendants require all Lady Jane's stylists to clock in ("activate") and clock out ("deactivate") on the POS system.

212.    Defendants require all Lady Jane's stylists to submit a copy of their driver's license, cosmetology or barber's license, email address, and photo before the stylist can create a profile on the POS system.

213.    Defendants require Plaintiffs and the similarly situated Lady Jane's stylists to enter all clients and services into the POS system.

214.    Defendants require stylists with less than 2 years of experience to go through the Lady Jane's training program.

215.    Lady Jane's stylists are expected to sell Defendants' Lady Jane's grooming products.

216.    Defendants set and control the prices of the Lady Jane's grooming products and the prices at which the products must be sold.

217.    Defendants preclude Plaintiffs and the similarly situated Lady Jane's stylists from selling or using any grooming products other than those provided by Defendants.

218.    Defendants require Plaintiffs and the similarly situated Lady Jane's stylists to perform daily cleaning duties at the salons.

219.    Defendants require Plaintiffs and the similarly situated Lady Jane's stylists to check their voicemails and text messages daily.

220.    Defendants require Plaintiffs and the similarly situated Lady Jane's stylists to submit maintenance reports to the central management team.

221.    Defendants require Plaintiffs and the similarly situated Lady Jane's stylists to conduct monthly retail product inventory counts.

222.    Defendants require Plaintiffs and the similarly situated Lady Jane's stylists to wash, dry, and restock towels.

223.    Defendants require Plaintiffs and the similarly situated Lady Jane's stylists to perform product counts, and report money generated from product sales each day.

224.    Defendants require Plaintiffs and the similarly situated Lady Jane's stylists to restock display shelves.

225.    Defendants require Plaintiffs and the similarly situated Lady Jane's stylists to restock and replenish styling products.

226.    Defendants require Plaintiffs and the similarly situated Lady Jane's stylists to answer phones during their shifts and perform various manual labor assignments.

227.    Defendants require Plaintiffs and the similarly situated Lady Jane's stylists to sweep, and perform other various cleaning tasks, take out the trash, count

and place the petty cash in the store safe, and lock the salon doors as part of the required "Closing procedures."

228. Defendants establish weekly and monthly benchmarks that Plaintiffs and the similarly situated Lady Jane's stylists are expected to achieve.

229. Defendants designate certain Lady Jane's stylists as "Key Holders."

230. Beyond the requirements that applied to all Lady Jane's stylists, Defendants required the Key Holders to arrive 30-45 minutes before the salon opened to the public to perform procedures to prepare the salon for opening, including: unlocking the door; turning on the towel warmers, wax pot, shaving cream dispensers, computers, and televisions; open the petty cash tracker; count and report petty cash; manage the other stylists, including making sure each stylist "activated" or logged-in to the POS system; and other tasks to prepare the salon for customers.

231. Key Holders are not paid a direct wage for performing these additional responsibilities, instead Defendants take 1% less of their service fee than Defendants take from the other Lady Jane's stylists.

232. Defendants have standardized rent agreements for their Lady Jane's stylists.

233. Defendants have and use standardized rate increases for their stylists based on job duties and job tenure.

234. Plaintiffs and the similarly situated Lady Jane's stylists perform services integral to Lady Jane's primary business.

235. Defendants do not pay time-and-a-half overtime for hours worked in excess of 40 hours per week.

236. Defendants do not pay the stylists minimum wage for the hours they work in some or all workweeks.

## PLAINTIFF'S INDIVIDUAL FACTUAL ALLEGATIONS

**Jamie Gavin**

237. Jamie Gavin worked for Defendants as a Lady Jane's stylist at Lady Jane's salons in Florida from November 2018-August 2022.

238. Defendant Lady Jane's Clearwater FL, LLC is the Defendant entity that owned the Florida Lady Jane's salon(s) where Jamie Gavin worked.

239. In September 2022, Jamie Gavin transferred to a Lady Jane's in in Missouri, and she worked there as a Lady Jane's stylist until July 2023.

240. Lady Jane's Sunset Hills MO, LLC is the Defendant entity that owned the Missouri Lady Jane's salon where Jamie Gavin worked.

241. Jamie Gavin worked pursuant to an "independent contractor" agreement.

242.    Jamie Gavin had no ability to negotiate her agreement. The terms were set by Defendants and offered to Jamie Gavin on a take it or leave it basis.

243.    Jamie Gavin was required to perform work according to the specific requirements and instructions provided by Defendants.

244.    Jamie Gavin received a percentage of each service she performed.

245.    Jamie Gavin had to work designated shifts and was not free to set her own schedule.

246.    Jamie Gavin was not allowed to set or alter the prices that applied to the services she provided.

247.    The costs of services Jamie Gavin provided were paid to Lady Jane's, then Lady Jane's paid Jamie Gavin according to a set percentage set by Lady Jane's.

248.    Lady Jane's would keep one dollar from each haircut to put towards a Lady Jane's Charitable Foundation, but the stylists would only receive commission on the price of the haircut less than $1.

249.    Jamie Gavin did not consent to giving a $1 from each haircut to Lady Jane's charitable foundation.

250.    Jamie Gavin was not permitted to leave when she did not have any customers. She had to be present and available to service any customers who walked in.

251.     Jamie Gavin had to complete a number of non-stylists job duties to keep the location functioning and organized.

252.     When Jamie Gavin attempted to deviate from the rules set by Defendants, she was disciplined or admonished.

253.     Defendants charged Jamie Gavin for the right to work in the Lady Jane's salons.

254.     Defendants charged Jamie Gavin "rent" of her booth rental at the Lady Jane's salons where she worked.

255.     During the tenure of her employment with Defendants the "rent" ranged from 52-60% of the daily revenue she collected for performing her services if the customers paid in cash.

256.     The daily revenue was calculated from the total of the final service charges Jamie Gavin clients paid for her services, less any dollar amounts improperly initially deducted as donations to the Lady Jane's charitable foundation.

257.     Defendants deducted shop charges, and any additional promotional discounts set by the Defendants from the total service charge to establish the final service charge.

258.     During the tenure of her employment with Defendants the "rent" ranged from 55-63% of the daily revenue she collected for performing her services if the customers paid with a credit card.

259.     During the tenure of her employment with Defendants, Jamie Gavin was required to push the sales of Defendants' grooming products.

260.     Jamie Gavin was not paid directly by the clients whom she provided services to, but was instead paid by Defendants after they had taken "rent" from her services.

261.     In addition to the "rent" collected from the stylist services Jamie Gavin performed, Defendants required Jamie Gavin to pay them 86%-89% of the price of all grooming products sold.

262.     Jamie Gavin was required to use the Defendants' styling and cleaning products (hair gel, shampoo, conditioner, hair dye, etc.).

263.     Jamie Gavin was also required to pay an additional nominal daily "product fee" that counted as "rent" to Defendants for use of the Defendants' styling and cleaning products.

264.     Despite the Independent Contractor Agreement stating that Jamie Gavin could make her own schedule, she was not permitted to set her hours but was

instead required to work shifts in increments of 8 or 10 hours, except on Sundays, where the required shift was 7 hours.

265.    Jamie Gavin did not work for any other salon or provide stylist services to any other business or individual outside of the work she performed for Defendants.

266.    Generally, Jamie Gavin worked 2 shifts per week, but she would occasionally work up to 4 shifts per week.

267.    When Jamie Gavin worked 4 or more shifts per week, she regularly worked in excess of 40 hours per week and did not receive any overtime pay.

268.    Jamie Gavin was regularly contacted outside of her scheduled shifts to discuss her schedule and other Lady Jane's employment issues.

269.    When Jamie Gavin needed to take a sick day, she was required to contact the central management team to request permission.

270.    When Jamie Gavin needed to take a sick day or a personal day, she was responsible for contacting other Lady Jane's stylists to arrange to have her shift covered.

271.    When Jamie Gavin wanted to take a vacation day, she had to submit a request to the central management team for approval.

272. Defendants required Jamie Gavin to arrive between 15-30 minutes before her scheduled shifts.

273. During this pre-shift time as a Lady Jane's stylist, Jamie Gavin would perform the duties Defendants required her and the other Lady Jane's stylists to perform, including ensuring that her workstation and the rest of the salon was clean, stocked, and ready to serve clients.

274. At the start of her shift time, Jamie Gavin would log-in ("activate") to the POS system.

275. Jamie Gavin would log-out of the POS system if she left the building for lunch breaks.

276. If Jamie Gavin did not leave the building for lunch, she would remain logged-in to the POS system and be ready to assist a customer if he arrived during her lunch break. This resulted in Jamie Gavin often not taking any meal break.

277. Jamie Gavin would regularly stay beyond the scheduled end of her 8-hour or 10-hour shift to complete her closing duties.

278. As a Lady Jane's stylist, Jamie Gavin's closing duties included sweeping and cleaning her workstation, sweeping, and performing general cleaning duties in the salon, starting the laundry, taking out the trash, perform product counts, report money generated from that day's sales, restocking the grooming and

styling products used by all Lady Jane's stylists, and other various manual labor assignments.

279. Jamie Gavin did not receive any compensation from Defendants for completing her required opening and closing duties.

280. During her scheduled shifts, when Jamie Gavin was not performing stylist services for a client, she was expected to answer the phones and assist with customer service issues.

281. Jamie Gavin did not receive any compensation from Defendants for completing these required customer service duties.

282. Despite the Independent Contractor Agreement stating that Jamie Gavin could control over the method, manner, and means of performing her services, Defendants required Jamie Gavin to perform and charge the prices set for those services by Defendants.

283. Defendants maintain large signs in each of their salons that list the services provided and the charge for each service:



284.     Jamie Gavin was not paid a minimum wage as required by the FLSA and

Missouri and Florida law.

285.     For example, in January 2021, the Federal Minimum wage was $7.25.

If Jamie Gavin worked 4 shifts per week for the 4 weeks of that month, she should

have made $1,160.00. However, Jamie Gavin only made $635.95. Defendants failed

to ensure that Jamie Gavin was paid at least the federal minimum wage for her hours

worked.

286.     In January 2021, the Florida state minimum wage was $8.65. If Jamie

Gavin worked 4 shifts per week for the 4 weeks of that month, she should have made

$1,384. Instead, Jamie Gavin only made $635.95. Defendants failed to ensure that Jamie Gavin was paid at least the Florida minimum wage for her hours worked.

287.    Defendants control over Jamie Gavin's role as a stylist resulted in an employee-employer relationship as opposed to the independent contractor relationship Defendants seek to hide behind.

**Lindsay Gibbons**

288.    Lindsay Gibbons worked for Defendants as a Lady Jane's stylist at Lady Jane's salons in Florida from 2014-2019.

289.    Lady Jane's Clearwater FL, LLC, is the Defendant entity that owned the Florida Lady Jane's salon(s) where Lindsay Gibbons worked.

290.    Lindsay Gibbons worked pursuant to an "independent contractor" agreement.

291.    Lindsay Gibbons had no ability to negotiate her agreement. The terms were set by Defendants and offered to Lindsay Gibbons on a take it or leave it basis.

292.    Lindsay Gibbons was required to perform work according to the specific requirements and instructions provided by Defendants.

293.    Lindsay Gibbons received a percentage of each service she performed.

294.    Lindsay Gibbons had to work designated shifts and was not free to set her own schedule.

44

295.    Lindsay Gibbons was not allowed to set or alter the prices that applied to the services she provided.

296.    The costs of services Lindsay Gibbons provided were paid to Lady Jane's, then Lady Jane's paid Lindsay Gibbons according to a set percentage set by Lady Jane's.

297.    Lindsay Gibbons was not permitted to leave when she did not have any customers. She had to be present and available to service any customers who walked in.

298.    Lindsay Gibbons had to complete a number of non-stylists job duties to keep the location functioning and organized.

299.    When Lindsay Gibbons attempted to deviate from the rules set by Defendants, she was disciplined or admonished.

300.    Defendants charged Lindsay Gibbons for the right to work in the Lady Jane's salons.

301.    Defendants charged Lindsay Gibbons "rent" of her booth rental at the Lady Jane's salons where she worked.

302.    During the tenure of her employment with Defendants the "rent" ranged from 57-60% of the daily revenue she collected for performing her services if the customers paid in cash.

303.    The daily revenue was calculated from the total of the final service charges Lindsay Gibbons clients paid for her services.

304.    Defendants deducted shop charges, and any additional promotional discounts set by the Defendants from the total service charge to establish the final service charge.

305.    During the tenure of her employment with Defendants, Lindsay Gibbons was required to push the sales of Defendants' grooming products.

306.    Lindsay Gibbons was not paid directly by the clients whom she provided services to but was instead paid by Defendants after they had taken "rent" from her services.

307.    In addition to the "rent" collected from the stylist services Lindsay Gibbons performed, Defendants required Lindsay Gibbons to pay them 86%-89% of the price of all grooming products sold.

308.    Lindsay Gibbons was required to use the Defendants' styling and cleaning products (hair gel, shampoo, conditioner, hair dye, etc.).

309.    Lindsay Gibbons was also required to pay an additional nominal daily "product fee" that counted as "rent" to Defendants for use of the Defendants' styling and cleaning products.

310.     Despite the Independent Contractor Agreement stating that Lindsay Gibbons could make her own schedule, she was not permitted to set her hours but was instead required to work shifts in increments of 10 hours, except on Sundays, where the required shift was 7 hours.

311.     Lindsay Gibbons did not work for any other salon or provide stylist services to any other business or individual outside of the work she performed for Defendants.

312.     Generally, Lindsay Gibbons worked 5 days per week.

313.     Lindsay Gibbons was regularly contacted outside of her scheduled shifts to discuss her schedule and other Lady Jane's employment issues.

314.     When Lindsay Gibbons needed to take a sick day, she was required to contact the central management team to request permission.

315.     When Lindsay Gibbons needed to take a sick day or a personal day, she was responsible for contacting other Lady Jane's stylists to arrange to have her shift covered.

316.     When Lindsay Gibbons wanted to take a vacation day, she had to submit a request to the central management team for approval.

317.     Defendants required Lindsay Gibbons to arrive between 15-30 minutes before her scheduled shifts.

47

318.    During this pre-shift time as a Lady Jane's stylist, Lindsay Gibbons would perform the duties Defendants required her and the other Lady Jane's stylists to perform, including ensuring that her workstation and the rest of the salon was clean, stocked, and ready to serve clients.

319.    At the start of her shift time, Lindsay Gibbons would log-in ("activate") to the POS system.

320.    Lindsay Gibbons would log-out of the POS system if she left the building for lunch breaks.

321.    If Lindsay Gibbons did not leave the building for lunch, she would remain logged-in to the POS system and be ready to assist a customer if he arrived during her lunch break. This resulted in Lindsay Gibbons often not taking any meal break.

322.    Lindsay Gibbons would regularly stay beyond the scheduled end of her 10-hour shift to complete her closing duties.

323.    As a Lady Jane's stylist, Lindsay Gibbons' closing duties included sweeping and cleaning her workstation, sweeping, and performing general cleaning duties in the salon, starting the laundry, taking out the trash, perform product counts, report money generated from that day's sales, restocking the grooming and

48

styling products used by all Lady Jane's stylists, and other various manual labor assignments.

324.     Lindsay Gibbons did not receive any compensation from Defendants for completing her required opening and closing duties.

325.     During her scheduled shift, when Lindsay Gibbons was not performing stylist services for a client, she was expected to answer the phones and assist with customer service issues.

326.     Lindsay Gibbons did not receive any compensation from Defendants for completing these required customer service duties.

327.     During her employment with Lady Jane's, Lindsay Gibbons also performed the role of Key Holder for a few months.

328.     As a Key Holder, Lindsay Gibbons had additional pre-shift and post-shift cleaning and administrative duties that she did not receive any additional compensation for. These additional duties included unlocking the building, rolling towels, stocking shelves, turning on televisions, paying out the stylists at the end of the shifts and various other duties to prepare the salon for opening and closing.

329.     As a stylist and a Key Holder, Lindsay Gibbons regularly worked in excess of 40 hours per week and did not receive any over-time pay.

330. Despite the Independent Contractor Agreement stating that Lindsay Gibbons could control over the method, manner, and means of performing her services, Defendants required Jamie Gavin to perform and charge the prices set for those services by Defendants.

331. Defendants maintain large signs in each of their salons that list the services provided and the charge for each service:



332. Lindsay Gibbons was not paid a minimum wage as required by the FLSA and Florida law.

333.    Defendants' control over Lindsay Gibbons' role as a stylist and key holder resulted in an employee-employer relationship as opposed to the independent contractor relationship Defendants seek to hide behind.

**Jhamya Winters**

334.    Jhamya Winters worked for Defendants as a Lady Jane's stylist at Lady Jane's salons in Oklahoma from January – August 2023.

335.    Lady Jane's Moore OK, LLC, is the Defendant entity that owned the Oklahoma Lady Jane's salon(s) where Jhamya Winters worked.

336.    Jhamya Winters worked pursuant to an "independent contractor" agreement.

337.    Jhamya Winters had no ability to negotiate her agreement. The terms were set by Defendants and offered to Jhamya Winters on a take it or leave it basis.

338.    Jhamya Winters was required to perform work according to the specific requirements and instructions provided by Defendants.

339.    Jhamya Winters received a percentage of each service she performed.

340.    Jhamya Winters had to work designated shifts and was not free to set her own schedule.

341.    Jhamya Winters was not allowed to set or alter the prices that applied to the services she provided.

342.     The costs of services Jhamya Winters provided were paid to Lady Jane's, then Lady Jane's paid Jhamya Winters according to a set percentage set by Lady Jane's.

343.     Jhamya Winters was not permitted to leave when she did not have any customers. She had to be present and available to service any customers who walked in.

344.     Jhamya Winters had to complete a number of non-stylists job duties to keep the location functioning and organized.

345.     When Jhamya Winters attempted to deviate from the rules set by Defendants, she was disciplined or admonished.

346.     Defendants charged Jhamya Winters for the right to work in the Lady Jane's salons.

347.     Defendants charged Jhamya Winters "rent" of her booth rental at the Lady Jane's salons where she worked.

348.     During the tenure of her employment with Defendants the "rent" ranged from 52-60% of the daily revenue she collected for performing her services if the customers paid in cash.

349.    The daily revenue was calculated from the total of the final service Jhamya Winters clients paid for her services, less any dollar amounts improperly initially deducted as donations to the Lady Jane's charitable foundation.

350.    Defendants deducted shop charges, and any additional promotional discounts set by the Defendants from the total service charge to establish the final service charge.

351.    During the tenure of her employment with Defendants the "rent" ranged from 55-63% of the daily revenue she collected for performing her services if the customers paid with a credit card.

352.    During the tenure of her employment with Defendants, Jhamya Winters was required to push the sales of Defendants' grooming products.

353.    Jhamya Winters was not paid directly by the clients to whom she provided services but was instead paid by Defendants after they had taken "rent" from her services.

354.    In addition to the "rent" collected from the stylist services Jhamya Winters performed, Defendants required Jhamya Winters to pay them 86%-89% of the price of all grooming products sold.

355.    Jhamya Winters was required to use the Defendants' styling and cleaning products (hair gel, shampoo, conditioner, hair dye, etc.).

356.     Jhamya Winters was also required to pay an additional nominal daily "product fee" that counted as "rent" to Defendants for use of the Defendants' styling and cleaning products.

357.     Despite the Independent Contractor Agreement stating that Jhamya Winters could make her own schedule, she was not permitted to set her hours but was instead required to work shifts in increments of 10 hours.

358.     Jhamya Winters did not work for any other salon or provide stylist services to any other business or individual outside of the work she performed for Defendants.

359.     Generally, Jhamya Winters worked between 4-6 days per week.

360.     Generally, Jhamya Winters worked at least 10 hours each day she worked.

361.     Jhamya Winters regularly worked in excess of 40 hours per week and did not receive any over-time pay.

362.     Jhamya Winters was regularly contacted outside of her scheduled shifts to discuss her schedule and other Lady Jane's employment issues.

363.     When Jhamya Winters needed to take a sick day, she was required to contact the central management team to request permission.

364.    When Jhamya Winters needed to take a sick day or a personal day, she was responsible for contacting other Lady Jane's stylists to arrange to have her shift covered.

365.    When Jhamya Winters wanted to take a vacation day, she had to submit a request to the central management team for approval.

366.    Defendants required Jhamya Winters to arrive between 15-30 minutes before her scheduled shifts.

367.    During this pre-shift time as a Lady Jane's stylist, Jhamya Winters would perform the duties Defendants required her and the other Lady Jane's stylists to perform, including ensuring that her workstation and the rest of the salon was clean, stocked, and ready to serve clients.

368.    At the start of her shift time, Jhamya Winters would log-in ("activate") to the POS system.

369.    Jhamya Winters would log-out of the POS system if she left the building for lunch breaks.

370.    If Jhamya Winters did not leave the building for lunch, she would remain logged-in to the POS system and be ready to assist a customer if he arrived during her lunch break. This resulted in Jhamya Winters often not taking any meal break.

371. Jhamya Winters would regularly stay beyond the scheduled end of her 10-hour shift to complete her closing duties.

372. As a Lady Jane's stylist, Jhamya Winters' closing duties included sweeping and cleaning her workstation, sweeping, and performing general cleaning duties in the salon, starting the laundry, taking out the trash, perform product counts, report money generated from that day's sales, restocking the grooming and styling products used by all Lady Jane's stylists, and other various manual labor assignments.

373. Jhamya Winters did not receive any compensation from Defendants for completing her required opening and closing duties.

374. During her scheduled shifts, when Jhamya Winters was not performing stylist services for a client, she was expected to answer the phones and assist with customer service issues.

375. Jhamya Winters did not receive any compensation from Defendants for completing these required customer service duties.

376. Despite the Independent Contractor Agreement stating that Jhamya Winters could control over the method, manner, and means of performing her services, Defendants required Jhamya Winters to perform and charge the prices set for those services by Defendants.

56

377.    Defendants maintain large signs in each of their salons that list the services provided and the charge for each service:



378.    Jhamya Winters was not paid a minimum wage as required by the FLSA and Oklahoma law.

379.    Defendants control over Jhamya Winters' role as a stylist resulted in an employee-employer relationship as opposed to the independent contractor relationship Defendants seek to hide behind.

## COLLECTIVE ACTION ALLEGATIONS

380.    Plaintiffs Jamie Gain, Lindsay Gibbons, and Jhamya Winters ("Plaintiffs") hereby incorporate by reference each of the foregoing allegations.

57

381. At all times material to this action, Defendants were "employers" of Plaintiffs and the Lady Jane's stylists as defined by §203(d) of the FLSA.

382. At all times material to this action Plaintiffs and the Lady Jane's stylists were "employees" of Defendants as defined by §203(e) of the FLSA.

383. Defendants misclassified Plaintiffs and the Lady Jane's stylists as "independent contractors."

384. Plaintiffs brings the First and Second Counts under 29 U.S.C. 216(b) on behalf of herself and a collective consisting of:

> All former stylists employed by Defendants (other than in the State of Ohio) between the date three years prior to the filing of this Complaint, and the date of final judgment in this matter who elect to opt-in to this action (the "FLSA Collective").

385. At all relevant times, Plaintiffs and the FLSA Collective have been similarly situated, have had substantially similar job duties, requirements, and pay provisions, and have all been subject to Defendants' decision, policy, plan, practices, procedures, protocols, and rules of willfully failing to pay the wages of Plaintiffs and the FLSA Collective and refusing to pay Plaintiffs and the FLSA Collective minimum wage for all hours worked. Plaintiffs' claims are essentially the same as those of the FLSA Collective.

386. Defendants failed to pay Plaintiffs and the FLSA Collective a direct wage, which resulted in a violation of the FLSA minimum wage provision.

387.    Defendants are aware or should have been aware that federal law required them to pay employees minimum wage for all hours worked.

388.    Defendants failed to pay Plaintiffs and the FLSA Collective at least the federal minimum wage for all hours worked.

389.    Defendants failed to pay Plaintiffs and the FLSA Collective at least "time-and-a-half" the federal mandated minimum for hours worked in excess of forty hours per week.

390.    Defendants failed to record all hours Plaintiffs and the FLSA Collective worked in and for the salon, which resulted in a violation of the FLSA's record keeping requirements.

391.    The FLSA Collective members are readily identifiable and ascertainable.

392.    For the purpose of notice and other purposes related to this action, the FLSA Collective members' names, addresses, email addresses, and phone numbers are readily available from Defendants' records.

393.    In recognition of the services Plaintiffs have rendered and will continue to render to the FLSA Collective, they will request payment of a service award upon resolution of this action.

## CLASS ACTION ALLEGATIONS

## Missouri Class Action Allegations

394.     Plaintiff Jamie Gavin brings the Third, Fourth, Fifth and Eighth Counts

under Federal Rule of Civil Procedure 23, on behalf of herself and a class of persons

consisting of:

> All Lady Jane's stylists employed by Defendants at Defendants' Lady
> Jane's salons in the state of Missouri between the date five years prior
> to the filing of the original Complaint, and the date of final judgment in
> this matter ("Rule 23 Class").

395.     Excluded from the Rule 23 Class are Defendants' legal representatives,

officers, directors, assigns, and successors, or any individual who has, or who at any

time during the class period has had, a controlling interest in Defendants; the

Judge(s) to whom this case is assigned and any member of the Judges' immediate

family; and all persons who will submit timely and otherwise proper requests for

exclusion from the Rule 23 Class.

396.     The number and identity of the Rule 23 Class members are

ascertainable from Defendants' records.

397.     The hours assigned and worked, the positions held, and the rates of pay

for each Rule 23 Class Member are also determinable from Defendants' records.

60

398.   For the purpose of notice and other purposes related to this action, their names, addresses, email addresses, and phone numbers are readily available from Defendants.

399.   Notice can be provided by means permissible under Federal Rule of Civil Procedure 23 for the Rule 23 Class members.

400.   The Rule 23 Class is so numerous that joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the Court.

401.   There are more than 50 Rule 23 Class members.

402.   The disposition of the Rule 23 Class members' claims as a class will benefit the parties and the Court.

403.   Jamie Gavin's claims are typical of those claims which could be alleged by any Rule 23 Class member, and the relief sought is typical of the relief which would be sought by each Rule 23 Class member in separate actions.

404.   Jamie Gavin and the Rule 23 Class members were subject to the same corporate practices of Defendants, as alleged herein, of failing to pay minimum wage, failing to pay overtime wages, and being unjust enriched through their relationship with the stylists.

405.    Jamie Gavin and the Rule 23 Class members have all sustained similar types of damages as a result of Defendants' failure to comply with the MMWA and the doctrine of unjust enrichment.

406.    Plaintiff seeks equitable tolling of the claims asserted on behalf of Plaintiff and the Rule 23 Class members such that they are permitted to recover their unpaid wages and damages for a period of six years in light of the fact that Defendants have consistently misrepresented the legal requirements and standards, both in their independent contractor agreements and through their behaviors and other communications, that apply to the working relationship between Defendants and the Rule 23 Class members.

407.    Jamie Gavin and the Rule 23 Missouri Class members have all been injured in that they have been uncompensated to Defendants' common policies, practices, and patterns of conduct. Defendants' policies and practices affected all Rule 23 Missouri Class members similarly, and Defendants benefited from the same type of unfair and/or wrongful acts as to each of the Rule 23 Class members.

408.    Jamie Gavin and the Rule 23 Class members sustained similar losses, injuries, and damages arising from the same unlawful practices, polices, and procedures.

409.    By seeking to represent the interests of the Rule 23 Class members, Jamie Gavin is exercising and intends to exercise his right to engage in concerted activity for the mutual aid or benefit of himself and his co-workers.

410.    Jamie Gavin is able to fairly and adequately protect the interests of the Rule 23 Class and has no interests antagonistic to the Rule 23 Class.

411.    Jamie Gavin is represented by attorneys who are experienced and competent in both class action litigation and employment litigation.

412.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy, particularly in the context of wage and hour litigation on behalf of minimum wage employees where individual class members lack the financial resources to vigorously prosecute a lawsuit against corporate defendants. Class action treatment will permit similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of efforts and expense that numerous individual actions engender. Because the losses, injuries, and damages suffered by each of the individual Rule 23 Class members are small in the sense pertinent to class action analysis, the expenses and burden of individual litigation would make it extremely difficult or impossible for the individual Rule 23 Class members to redress the wrongs done to them. On the other hand, important public interests will be served

by addressing the matter as a class action. The adjudication of individual litigation

claims would result in a great expenditure of Court and public resources; however,

treating the claims as a class action would result in significant saving of these costs.

The prosecution of separate actions by individual class members would create a risk

of inconsistent and/or varying adjudications with respect to the individual Rule 23

Class members, establishing incompatible standards of conduct for Defendants and

resulting in the impairment of the Rule 23 Class members' rights and the disposition

of their interests through actions to which they were not parties. The issues in this

action can be decided by means of common, class-wide proof. In addition, if

appropriate, the Court can, and is empowered to, fashion methods to efficiently

manage this action as a class action.

413.    Current employees are often afraid to assert their rights out of fear of

direct and indirect retaliation. Former employees are fearful of bringing claims

because doing so can harm their employment, future employment, and future efforts

to secure employment. Class actions provide class members who are not named in

the complaint a degree of anonymity, which allows for the vindication of their rights

while eliminating or reducing these risks.

414.    This action is properly maintainable as a class action under Federal Rule

of Civil Procedure 23(b)(3).

415. Common questions of law and fact exist as to the Rule 23 Class that predominate over any questions only affecting Jamie Gavin and the Rule 23 Class members individually and include, but are not limited to:

a. Whether Defendants misclassified Jamie Gavin and the Rule 23 Class Members as independent contractors;

b. Whether the permanency of the relationship between the parties, the degree of skill required for the rendering of the services, the stylists' investment in equipment or materials for the task, the stylists' opportunity for profit or loss depending upon their skill, the degree of Defendants' right to control the manner in which the work was performed, and whether the services rendered were an integral part of the Defendants' business;

c. Whether Defendants paid Jamie Gavin and the Rule 23 Class members for all hours worked;

d. Whether Defendants paid Jamie Gavin and the Rule 23 Class members minimum wage for all hours worked and overtime wages for hours worked in excess of 40 per workweek;

e. Whether Defendants took unlawful deductions from the wages of Jamie Gavin and Rule 23 Class members;

f. Whether Defendants failed to pay Jamie Gavin and the Rule 23 Class in a timely manner;

g. Whether the wages due to Jamie Gavin and the Rule 23 Class were in dispute at the time they were denied to them;

h. Whether Jamie Gavin and the Rule 23 Class members conferred a benefit on Defendants;

i. Whether Defendants were aware of the benefits conferred on them by Jamie Gavin and the Rule 23 Class members;

j. Whether it would be unjust for Defendants to retain the benefits conferred on them Jamie Gavin and the Rule 23 Class members;

k.    Whether Defendants receive a benefit by requiring Jamie Gavin and the Rule 23 Class members to pay for and use their supplies;

l.    Whether Defendants receive a benefit by paying Jamie Gavin and the Rule 23 Class members as independent contractors instead of employees;

m.    Whether Defendants receive a benefit from charging monthly "rent" to Jamie Gavin and the Rule 23 Class members;

n.    Whether Defendants receive a benefit by requiring Jamie Gavin and the Rule 23 Class members to work a minimum number of hours;

o.    Whether Defendants receive a benefit by requiring Jamie Gavin and the Rule 23 Class members to complete various operational, organizational, and managerial duties for which they are not paid a wage;

p.    How much it would cost Defendants to offer the same service while paying Jamie Gavin and the Rule 23 Class members as employees instead of independent contractors;

q.    The nature and extent of class-wide injury and the measure of damages for those injuries.

416.    In recognition of the services Jamie Gavin has rendered and will continue to render to the Rule 23 Class, Jamie Gavin will each request payment of a service award upon resolution of this action.

### Florida Class Action Allegations

417.    Plaintiff Lindsay Gibbons brings the Sixth and Ninth Counts under Federal Rule of Civil Procedure 23, on behalf of herself and a class of persons consisting of:

All Lady Jane's stylists employed by Defendants at Defendants' Lady Jane's salons in the state of Florida between the date five years prior to the filing of the original Complaint, and the date of final judgment in this matter ("Rule 23 Class").

418. Excluded from the Rule 23 Class are Defendants' legal representatives, officers, directors, assigns, and successors, or any individual who has, or who at any time during the class period has had, a controlling interest in Defendants; the Judge(s) to whom this case is assigned and any member of the Judges' immediate family; and all persons who will submit timely and otherwise proper requests for exclusion from the Rule 23 Class.

419. The number and identity of the Rule 23 Class members are ascertainable from Defendants' records.

420. The hours assigned and worked, the positions held, and the rates of pay for each Rule 23 Class Member are also determinable from Defendants' records.

421. For the purpose of notice and other purposes related to this action, their names, addresses, email addresses, and phone numbers are readily available from Defendants.

422. Notice can be provided by means permissible under Federal Rule of Civil Procedure 23 for the Rule 23 Class members.

423. The Rule 23 Class is so numerous that joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the Court.

424. There are more than 50 Rule 23 Class members.

425. The disposition of the Rule 23 Class members' claims as a class will benefit the parties and the Court.

426. Lindsay Gibbons' claims are typical of those claims which could be alleged by any Rule 23 Class member, and the relief sought is typical of the relief which would be sought by each Rule 23 Class member in separate actions.

427. Lindsay Gibbons and the Rule 23 Class members were subject to the same corporate practices of Defendants, as alleged herein, of failing to pay minimum wage, failing to pay overtime wages, and being unjust enriched through their relationship with the stylists.

428. Lindsay Gibbons and the Rule 23 Class members have all sustained similar types of damages as a result of Defendants' failure to comply with the Florida Constitution and the doctrine of unjust enrichment.

429. Plaintiff seeks equitable tolling of the claims asserted on behalf of Plaintiff and the Rule 23 Class members such that they are permitted to recover their unpaid wages and damages for a period of six years in light of the fact that Defendants

have consistently misrepresented the legal requirements and standards, both in their independent contractor agreements and through their behaviors and other communications, that apply to the working relationship between Defendants and the Rule 23 Class members.

430.     Lindsay Gibbons and the Rule 23 Florida Class members have all been injured in that they have been uncompensated to Defendants' common policies, practices, and patterns of conduct. Defendants' policies and practices affected all Rule 23 Florida Class members similarly, and Defendants benefited from the same type of unfair and/or wrongful acts as to each of the Rule 23 Class members.

431.     Lindsay Gibbons and the Rule 23 Class members sustained similar losses, injuries, and damages arising from the same unlawful practices, polices, and procedures.

432.     By seeking to represent the interests of the Rule 23 Class members, Lindsay Gibbons is exercising and intends to exercise his right to engage in concerted activity for the mutual aid or benefit of himself and his co-workers.

433.     Lindsay Gibbons is able to fairly and adequately protect the interests of the Rule 23 Class and has no interests antagonistic to the Rule 23 Class.

434.     Lindsay Gibbons is represented by attorneys who are experienced and competent in both class action litigation and employment litigation.

435. A class action is superior to other available methods for the fair and efficient adjudication of the controversy, particularly in the context of wage and hour litigation on behalf of minimum wage employees where individual class members lack the financial resources to vigorously prosecute a lawsuit against corporate defendants. Class action treatment will permit similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of efforts and expense that numerous individual actions engender. Because the losses, injuries, and damages suffered by each of the individual Rule 23 Class members are small in the sense pertinent to class action analysis, the expenses and burden of individual litigation would make it extremely difficult or impossible for the individual Rule 23 Class members to redress the wrongs done to them. On the other hand, important public interests will be served by addressing the matter as a class action. The adjudication of individual litigation claims would result in a great expenditure of Court and public resources; however, treating the claims as a class action would result in significant saving of these costs. The prosecution of separate actions by individual class members would create a risk of inconsistent and/or varying adjudications with respect to the individual Rule 23 Class members, establishing incompatible standards of conduct for Defendants and resulting in the impairment of the Rule 23 Class members' rights and the disposition

of their interests through actions to which they were not parties. The issues in this action can be decided by means of common, class-wide proof. In addition, if appropriate, the Court can, and is empowered to, fashion methods to efficiently manage this action as a class action.

436.     Current employees are often afraid to assert their rights out of fear of direct and indirect retaliation. Former employees are fearful of bringing claims because doing so can harm their employment, future employment, and future efforts to secure employment. Class actions provide class members who are not named in the complaint a degree of anonymity, which allows for the vindication of their rights while eliminating or reducing these risks.

437.     This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23(b)(3).

438.     Common questions of law and fact exist as to the Rule 23 Class that predominate over any questions only affecting Lindsay Gibbons and the Rule 23 Class members individually and include, but are not limited to:

    a.    Whether Defendants misclassified Lindsay Gibbons and the Rule 23 Class Members as independent contractors;

    b.    Whether the permanency of the relationship between the parties, the degree of skill required for the rendering of the services, the stylists' investment in equipment or materials for the task, the stylists' opportunity for profit or loss depending upon their skill, the degree of Defendants' right to control the

manner in which the work was performed, and whether the services rendered were an integral part of the Defendants' business;

c. Whether Defendants paid Lindsay Gibbons and the Rule 23 Class members for all hours worked;

d. Whether Defendants paid Lindsay Gibbons and the Rule 23 Class members minimum wage for all hours worked and overtime wages for hours worked in excess of 40 per workweek;

e. Whether Defendants took unlawful deductions from the wages of Lindsay Gibbons and Rule 23 Class members;

f. Whether Defendants failed to pay Lindsay Gibbons and the Rule 23 Class in a timely manner;

g. Whether the wages due to Lindsay Gibbons and the Rule 23 Class were in dispute at the time they were denied to them;

h. Whether Lindsay Gibbons and the Rule 23 Class members conferred a benefit on Defendants;

i. Whether Defendants were aware of the benefits conferred on them by Lindsay Gibbons and the Rule 23 Class members;

j. Whether it would be unjust for Defendants to retain the benefits conferred on them Lindsay Gibbons and the Rule 23 Class members;

k. Whether Defendants receive a benefit by requiring Lindsay Gibbons and the Rule 23 Class members to pay for and use their supplies;

l. Whether Defendants receive a benefit by paying Lindsay Gibbons and the Rule 23 Class members as independent contractors instead of employees;

m. Whether Defendants receive a benefit from charging monthly "rent" to Lindsay Gibbons and the Rule 23 Class members;

n. Whether Defendants receive a benefit by requiring Lindsay Gibbons and the Rule 23 Class members to work a minimum number of hours;

o. Whether Defendants receive a benefit by requiring Lindsay Gibbons and the Rule 23 Class members to complete various operational, organizational, and managerial duties for which they are not paid a wage;

p. How much it would cost Defendants to offer the same service while paying Lindsay Gibbons and the Rule 23 Class members as employees instead of independent contractors;

q. The nature and extent of class-wide injury and the measure of damages for those injuries.

439. In recognition of the services Lindsay Gibbons has rendered and will continue to render to the Rule 23 Class, Lindsay Gibbons will each request payment of a service award upon resolution of this action.

**Oklahoma Class Action Allegations**

440. Plaintiff Jhamya Winters brings the Seventh and Tenth Counts under Federal Rule of Civil Procedure 23, on behalf of herself and a class of persons consisting of:

> All Lady Jane's stylists employed by Defendants at Defendants' Lady Jane's salons in the state of Oklahoma between the date five years prior to the filing of the original Complaint, and the date of final judgment in this matter ("Rule 23 Class").

441. Excluded from the Rule 23 Class are Defendants' legal representatives, officers, directors, assigns, and successors, or any individual who has, or who at any time during the class period has had, a controlling interest in Defendants; the Judge(s) to whom this case is assigned and any member of the Judges' immediate

family; and all persons who will submit timely and otherwise proper requests for exclusion from the Rule 23 Class.

442.   The number and identity of the Rule 23 Class members are ascertainable from Defendants' records.

443.   The hours assigned and worked, the positions held, and the rates of pay for each Rule 23 Class Member are also determinable from Defendants' records.

444.   For the purpose of notice and other purposes related to this action, their names, addresses, email addresses, and phone numbers are readily available from Defendants.

445.   Notice can be provided by means permissible under Federal Rule of Civil Procedure 23 for the Rule 23 Class members.

446.   The Rule 23 Class is so numerous that joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the Court.

447.   There are more than 50 Rule 23 Class members.

448.   The disposition of the Rule 23 Class members' claims as a class will benefit the parties and the Court.

449.    Jhamya Winters' claims are typical of those claims which could be alleged by any Rule 23 Class member, and the relief sought is typical of the relief which would be sought by each Rule 23 Class member in separate actions.

450.    Jhamya Winters and the Rule 23 Class members were subject to the same corporate practices of Defendants, as alleged herein, of failing to pay minimum wage, failing to pay overtime wages, and being unjust enriched through their relationship with the stylists.

451.    Jhamya Winters and the Rule 23 Class members have all sustained similar types of damages as a result of Defendants' failure to comply with the Florida Constitution and the doctrine of unjust enrichment.

452.    Plaintiff seeks equitable tolling of the claims asserted on behalf of Plaintiff and the Rule 23 Class members such that they are permitted to recover their unpaid wages and damages for a period of six years in light of the fact that Defendants have consistently misrepresented the legal requirements and standards, both in their independent contractor agreements and through their behaviors and other communications, that apply to the working relationship between Defendants and the Rule 23 Class members.

453.    Jhamya Winters and the Rule 23 Oklahoma Class members have all been injured in that they have been uncompensated to Defendants' common

policies, practices, and patterns of conduct. Defendants' policies and practices affected all Rule 23 Oklahoma Class members similarly, and Defendants benefited from the same type of unfair and/or wrongful acts as to each of the Rule 23 Class members.

454.    Jhamya Winters and the Rule 23 Class members sustained similar losses, injuries, and damages arising from the same unlawful practices, polices, and procedures.

455.    By seeking to represent the interests of the Rule 23 Class members, Jhamya Winters is exercising and intends to exercise his right to engage in concerted activity for the mutual aid or benefit of himself and his co-workers.

456.    Jhamya Winters is able to fairly and adequately protect the interests of the Rule 23 Class and has no interests antagonistic to the Rule 23 Class.

457.    Jhamya Winters is represented by attorneys who are experienced and competent in both class action litigation and employment litigation.

458.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy, particularly in the context of wage and hour litigation on behalf of minimum wage employees where individual class members lack the financial resources to vigorously prosecute a lawsuit against corporate defendants. Class action treatment will permit similarly situated persons to

prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of efforts and expense that numerous individual actions engender. Because the losses, injuries, and damages suffered by each of the individual Rule 23 Class members are small in the sense pertinent to class action analysis, the expenses and burden of individual litigation would make it extremely difficult or impossible for the individual Rule 23 Class members to redress the wrongs done to them. On the other hand, important public interests will be served by addressing the matter as a class action. The adjudication of individual litigation claims would result in a great expenditure of Court and public resources; however, treating the claims as a class action would result in significant saving of these costs. The prosecution of separate actions by individual class members would create a risk of inconsistent and/or varying adjudications with respect to the individual Rule 23 Class members, establishing incompatible standards of conduct for Defendants and resulting in the impairment of the Rule 23 Class members' rights and the disposition of their interests through actions to which they were not parties. The issues in this action can be decided by means of common, class-wide proof. In addition, if appropriate, the Court can, and is empowered to, fashion methods to efficiently manage this action as a class action.

459.     Current employees are often afraid to assert their rights out of fear of direct and indirect retaliation. Former employees are fearful of bringing claims because doing so can harm their employment, future employment, and future efforts to secure employment. Class actions provide class members who are not named in the complaint a degree of anonymity, which allows for the vindication of their rights while eliminating or reducing these risks.

460.     This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23(b)(3).

461.     Common questions of law and fact exist as to the Rule 23 Class that predominate over any questions only affecting Jhamya Winters and the Rule 23 Class members individually and include, but are not limited to:

      a.     Whether Defendants misclassified Jhamya Winters and the Rule 23 Class Members as independent contractors;

      b.     Whether the permanency of the relationship between the parties, the degree of skill required for the rendering of the services, the stylists' investment in equipment or materials for the task, the stylists' opportunity for profit or loss depending upon their skill, the degree of Defendants' right to control the manner in which the work was performed, and whether the services rendered were an integral part of the Defendants' business;

      c.     Whether Defendants paid Jhamya Winters and the Rule 23 Class members for all hours worked;

d.      Whether Defendants paid Jhamya Winters and the Rule 23 Class members minimum wage for all hours worked and overtime wages for hours worked in excess of 40 per workweek;

e.      Whether Defendants took unlawful deductions from the wages Jhamya Winters and Rule 23 Class members;

f.      Whether Defendants failed to pay Jhamya Winters and the Rule 23 Class in a timely manner;

g.      Whether the wages due to Jhamya Winters and the Rule 23 Class were in dispute at the time they were denied to them;

h.      Whether Jhamya Winters and the Rule 23 Class members conferred a benefit on Defendants;

i.      Whether Defendants were aware of the benefits conferred on them by Jhamya Winters and the Rule 23 Class members;

j.      Whether it would be unjust for Defendants to retain the benefits conferred on them Jhamya Winters and the Rule 23 Class members;

k.      Whether Defendants receive a benefit by requiring Jhamya Winters and the Rule 23 Class members to pay for and use their supplies;

l.      Whether Defendants receive a benefit by paying Jhamya Winters and the Rule 23 Class members as independent contractors instead of employees;

m.      Whether Defendants receive a benefit from charging monthly "rent" to Jhamya Winters and the Rule 23 Class members;

n.      Whether Defendants receive a benefit by requiring Jhamya Winters and the Rule 23 Class members to work a minimum number of hours;

o.      Whether Defendants receive a benefit by requiring Jhamya Winters and the Rule 23 Class members to complete various operational, organizational, and managerial duties for which they are not paid a wage;

p. How much it would cost Defendants to offer the same service while paying Jhamya Winters and the Rule 23 Class members as employees instead of independent contractors;

q. The nature and extent of class-wide injury and the measure of damages for those injuries.

462. In recognition of the services Jhamya Winters has rendered and will continue to render to the Rule 23 Class, Jhamya Winters will each request payment of a service award upon resolution of this action.

## CAUSES OF ACTION
### Count 1
### Failure to Pay Minimum Wages - Fair Labor Standards Act
### (On Behalf of Plaintiffs and the FLSA Collective)

463. Plaintiffs Jamie Gavin, Lindsay Gibbons, and Jhamya Winters restate and incorporate the foregoing allegations as if fully rewritten herein.

464. Plaintiffs and the FLSA Collective are employees entitled to receive no less than minimum wage for all hours worked.

465. Defendants failed to pay Plaintiffs and the FLSA Collective minimum wage for all hours worked.

466. By the acts and conduct described above, Defendants willfully violated the provisions of the FLSA and disregarded the rights of Plaintiffs and the FLSA Collective.

467.    Plaintiffs and the FLSA Collective have been damaged by Defendants' willful failure to pay minimum wage as required by law.

468.    As a result of Defendants' violations, Plaintiffs and the FLSA Collective are entitled to damages, including, but not limited to, unpaid wages, liquidated damages, costs, and attorneys' fees.

### Count 2
### Failure to Pay Overtime Wages - Fair Labor Standards Act
### (On Behalf of Plaintiffs and the FLSA Collective)

469.    Plaintiffs restate and incorporate the foregoing allegations as if fully rewritten herein.

470.    Plaintiffs and the FLSA Collective are employees entitled to receive no less than one-and-a-half times minimum wage for all hours worked in excess of forty (40) hours.

471.    Defendants failed to pay Plaintiffs and the FLSA Collective than one-and-a-half times minimum wage for all hours worked in excess of forty (40) hours.

472.    By the acts and conduct described above, Defendants willfully violated the provisions of the FLSA and disregarded the rights of Plaintiffs and the FLSA Collective.

473.    Plaintiffs and the FLSA Collective have been damaged by Defendants' willful failure to pay minimum wage as required by law.

474.    As a result of Defendants' violations, Plaintiffs and the FLSA Collective are entitled to damages, including, but not limited to, unpaid wages, liquidated damages, costs, and attorneys' fees.

**Count 3**
**Failure to Pay Minimum Wages – Missouri Minimum Wage Law R.S. Mo.§§290.500, *et seq.*
(On Behalf of Plaintiff Jamie Gavin and the Rule 23 Class)**

475.    Plaintiff Jamie Gavin restates and incorporates the foregoing allegations as if fully rewritten herein.

476.    The Missouri Minimum Wage Act (R.S. Mo. §§290.500, *et seq.*) requires that employees be paid not less than minimum wage as determined by an inflation index for all hours worked.

477.    By not paying Jamie Gavin and the Rule 23 Class at least minimum wage for each hour worked, Defendants have violated the Missouri Minimum Wage Act.

478.    As a result of Defendants' violations, Plaintiff and the Rule 23 Class are entitled to damages, including, but not limited to, unpaid wages, an additional two times unpaid wages, costs, and attorneys' fees.

**Count 4**

**Failure to Pay Overtime Wages – R.C. Mo. §290.050**
**(On Behalf of Plaintiff Jamie Gavin and the Rule 23 Class)**

479.     Plaintiff Jamie Gavin restates and incorporates the foregoing allegations as if fully rewritten herein.

480.     During all relevant times, Defendants were entities covered by the MMWA and Jamie Gavin and the Rule 23 Class were employees within the meaning of the MMWA and were not exempt from its protections.

481.     Plaintiff and the Rule 23 Class worked more than forty hours in one or more workweeks.

482.     Defendants did not pay Plaintiff and the Rule 23 Class one and one half times their regular rate for hours worked in excess of forty hours in a workweek.

483.     By not paying Plaintiff and the Rule 23 Class proper overtime wages for time worked in excess of forty hours in a workweek, Defendants have violated the MMWA, R.C. Mo. §290.050.

484.     As a result of Defendants' violations, Plaintiff and the Rule 23 Class are entitled to damages, including, but not limited to, unpaid wages, an additional two times unpaid wages, costs, and attorneys' fees.

## Count 5
### Failure to Pay Minimum Wages – Florida Constitution, Art. X, §24
### (On Behalf of Plaintiff Lindsay Gibbons and the Rule 23 Class)

485.     Plaintiff Lindsay Gibbons restates and incorporates the foregoing allegations as if fully rewritten herein.

486.     Defendants paid Lindsay Gibbons and the Rule 23 class below minimum wage for the hours they worked.

487.     By not paying Lindsay Gibbons and the Rule 23 class at least minimum wage for each hour worked, the Defendants have violated Florida Constitution, Art. X, Section 24.

488.     As a result of Defendants' violations, Lindsay Gibbons and the Rule 23 Class are entitled to damages, including, but not limited to, unpaid wages, unreimbursed expenses, an additional one times unpaid wages/unreimbursed expenses in damages under Section 24, costs, and attorneys' fees.

## Count 6
### Failure to Pay Minimum Wages – Oklahoma Minimum Wage Act
### 40 OK Stat. §1971.1, *et seq.*
### (On Behalf of Jhamya Winters and the Rule 23 Class)

489.     Plaintiff Jhamya Winters restates and incorporates the foregoing allegations as if fully rewritten herein.

490.    Defendants paid Jhamya Winters and the Rule 23 class below minimum wage for the hours they worked.

491.    By not paying Jhamya Winters and the Rule 23 class at least minimum wage for each hour worked, the Defendants have violated the Oklahoma Minimum Wage Act.

492.    As a result of Defendants' violations, Jhamya Winters and the Rule 23 Class are entitled to damages, including, but not limited to, , unpaid wages, an additional two times unpaid wages in damages, costs, and attorneys' fees.

**Count 7**
**Unjust Enrichment (Missouri Law)**
**(On Behalf of Plaintiff Jamie Gavin and the Rule 23 Class)**

493.    Plaintiff Jamie Gavin restates and incorporates the foregoing allegations as if fully rewritten herein.

494.    Jamie Gavin and the Rule 23 Class have conferred a benefit upon Defendants, namely, their wages.

495.    Defendants retained the wages of Jamie Gavin and the Rule 23 Class.

496.    Defendants knew that Jamie Gavin and the Rule 23 Class conferred that benefit on Defendants.

497.    As described above, Defendants received benefits as a result of retaining wages and tips provided by customers to the Jamie Gavin and the Rule 23 Class.

498.    The benefits include, but are not limited to, the employees' labor.

499.    Defendants did not compensate or under-compensate Jamie Gavin and the Rule 23 Class for these benefits.

500.    Accordingly, Defendants' retention of these benefits under these circumstances would be unjust.

501.    As a result of Defendants having been unjustly enriched, Jamie Gavin and the Rule 23 Class are entitled to compensation for the value of the benefit Jamie Gavin and the Rule 23 Class conferred on Defendants.

**Count 8**
**Unjust Enrichment (Florida Law)**
**(On Behalf of Plaintiff Lindsay Gibbons and the Rule 23 Class)**

502.    Plaintiff Lindsay Gibbons restates and incorporates the foregoing allegations as if fully rewritten herein.

503.    Lindsay Gibbons and the Rule 23 Class have conferred a benefit upon Defendants, namely, their wages.

504.    Defendants retained the wages of Lindsay Gibbons and the Rule 23 Class.

505.    Defendants knew that Lindsay Gibbons and the Rule 23 Class conferred that benefit on Defendants.

506.    As described above, Defendants received benefits as a result of retaining wages and tips provided by customers to the Lindsay Gibbons and the Rule 23 Class.

507.    The benefits include, but are not limited to, the employees' labor.

508.    Defendants did not compensate or under-compensate Lindsay Gibbons and the Rule 23 Class for these benefits.

509.    Accordingly, Defendants' retention of these benefits under these circumstances would be unjust.

510.    As a result of Defendants having been unjustly enriched, Lindsay Gibbons and the Rule 23 Class are entitled to compensation for the value of the benefit Lindsay Gibbons and the Rule 23 Class conferred on Defendants.

**Count 9**
**Unjust Enrichment (Oklahoma Law)**
**(On Behalf of Plaintiff Jhamya Winters and the Rule 23 Class)**

511.    Plaintiff Jhamya Winters restates and incorporates the foregoing allegations as if fully rewritten herein.

512.    Jhamya Winters and the Rule 23 Class have conferred a benefit upon Defendants, namely, their wages.

87

513. Defendants retained the wages of Jhamya Winters and the Rule 23 Class.

514. Defendants knew that Jhamya Winters and the Rule 23 Class conferred that benefit on Defendants.

515. As described above, Defendants received benefits as a result of retaining wages and tips provided by customers to the Jhamya Winters and the Rule 23 Class.

516. The benefits include, but are not limited to, the employees' labor.

517. Defendants did not compensate or under-compensate Jhamya Winters and the Rule 23 Class for these benefits.

518. Accordingly, Defendants' retention of these benefits under these circumstances would be unjust.

519. As a result of Defendants having been unjustly enriched, Jhamya Winters and the Rule 23 Class are entitled to compensation for the value of the benefit Jhamya Winters and the Rule 23 Class conferred on Defendants.

**WHEREFORE**, Plaintiffs Jamie Gavin, Lindsay Gibbons, and Jhamya Winters pray for all of the following relief:

A. Designation of this action as a collective action on behalf of the collective action members and prompt issuance of notice to all similarly-situated

members of an opt-in class, apprising them of this action, permitting them to assert timely wage and hour claims in this action, and appointment of Plaintiff and their counsel to represent the collective action members.

B. Unpaid minimum wages, overtime pay, and an additional and equal amount as liquidated damages pursuant to the FLSA and supporting regulations;

C. Designation of Plaintiff Jamie Gavin as representative of the Rule 23 Missouri Class and counsel of record as Class Counsel;

D. Designation of Plaintiff Lindsay Gibbons as representative of the Rule 23 Florida Class and counsel of record as Class Counsel;

E. Designation of Jhamya Winters as representative of the Rule 23 Oklahoma Class and counsel of records as Class Counsel.

F. Certification of this case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

G. A declaratory judgment that the practices complained of herein are unlawful under the MMWA.

H. An award of unpaid minimum and overtime wages under the MMWA.

I. An award of statutory damages under the MMWA.

J. An award of restitution as a result of unjust enrichment under Missouri law.

K.      A declaratory judgment that the practices complained of herein are unlawful under the Florida Constitution, Art. X, Section 24.

L.      An award of unpaid minimum wages and overtime wages due under Florida Constitution, Art. X, Section 24.

M.      An award of damages under Florida Constitution, Art. X, Section 24, based on Defendants' failure to pay wages, calculated as an additional one time of back wages.

N.      An award of restitution for unjust enrichment under Florida law.

O.      A declaratory judgement that the practices complained of herein are unlawful under the Oklahoma Minimum Wage Act.

P.      An award of unpaid minimum and overtime wages under the OMWA.

Q.      An award of statutory damages under the OMWA.

R.      An award of restitution as a result of unjust enrichment under Oklahoma law.

S.      An award of prejudgment and post-judgment interest.

T.      An award of costs and expenses of this action, together with reasonable attorneys' fees and expert fees.

U.      Such other legal and equitable relief as the Court deems appropriate.

90

Respectfully submitted,

*/s/ Laura E. Farmwald*
Andrew R. Biller (Ohio Bar No. 0081452)
Andrew P. Kimble (Ohio Bar No. 0093172)
Laura E. Farmwald (Ohio Bar No. 0095304)
Emily A. Hubbard (Ohio Bar No. 0096032)
BILLER & KIMBLE, LLC
8044 Montgomery Rd., Ste. 515
Cincinnati, OH 45236
Telephone: (513) 715-8711
Facsimile: (614) 340-4620
*abiller@billerkimble.com*
*akimble@billerkimble.com*
*lfarmwald@billerkimble.com*
*ehubbard@billerkimble.com*

www.billerkimble.com

and

Matthew J. Clark (P76690)
Gregory, Moore, Brooks & Clark, P.C.
Grand Park Centre
28 W. Adams, Suite 300
Detroit, MI 48226
Telephone: (313) 964-5600
Facsimile: (313) 964-2125
Matt@unionlaw.net

*Counsel for Plaintiffs and the putative classes*

91

## **JURY DEMAND**

Plaintiffs hereby demand a jury trial by the maximum persons permitted by law on all issues herein triable to a jury.

/s/ *Laura E. Farmwald*
Laura E. Farmwald